[No. 19463. *En Banc.* January 4, 1927.]

GREAT WESTERN LAND & IMPROVEMENT COMPANY,
*Respondent,* v. AMANDA SANDYGREN,
*Appellant.*[1]

[1] TRIAL (141)—VERDICTS—SPECIAL FINDINGS—INCONSISTENT WITH GENERAL VERDICT. Where a special finding that a bank did not purchase notes in good faith is inconsistent with another special finding that it had no notice of an infirmity through certain false representations, the two findings destroy each other; and the other special verdicts not being inconsistent with the general verdict, it is error to grant judgment upon the special verdict, notwithstanding the general verdict; and there being inconsistency in the special verdict indicating that the jury did not comprehend all the issues in the case, it is not error to deny judgment on the general verdict and to require a new trial (MITCHELL, J. dissenting).

Appeal from a judgment of the superior court for Spokane county, Huneke, J., entered April 18, 1925, upon the verdict of a jury in favor of the plaintiff, in an action upon promissory notes. Reversed.

*McCarthy, Edge & Lantz,* for appellant.

*Munter & Munter,* for respondent.

[1]Reported in 252 Pac. 123.

PARKER, J.—The plaintiff, Great Northern Land & Improvement Company, commenced two separate actions seeking recovery upon two promissory notes executed and delivered by the defendant, Mrs. Sandygren, to C. W. Brockman, by him transferred to the First Exchange National Bank of Coeur d'Alene, Idaho, and by that bank transferred to the plaintiff improvement company. One of the notes is for the principal sum of one thousand dollars and one for the principal sum of four thousand dollars. The two actions were consolidated for the purpose of trial, and were so tried in the superior court for Spokane county sitting with a jury.

The notes were executed and delivered on the same date by Mrs. Sandygren to Brockman for a single purchase by her of shares of stock in an oil company. The notes fell due at different dates, which seems to account for the commencement of separate actions thereon. The defense is, in substance, that Brockman made false and fraudulent representations to Mrs. Sandygren touching the condition of the oil company's properties and resources, which were in fact worthless, and by such false and fraudulent representations induced her to execute and deliver the notes to him as the purchase price of the stock; and also that both the Idaho bank and the improvement company did not acquire the notes in good faith, but with knowledge of such fraudulent acquisition of them by Brockman.

At the conclusion of the trial the jury returned a general verdict reading as follows:

"We, the jury in the case of Great Western Land & Improvement Co., plaintiff, vs. Amanda Sandygren, Defendant, find for defendant."

Accompanying this general verdict, the jury returned answers to five special interrogatories as follows:

"Special Verdict No. 1

"Did the First Exchange National Bank of Coeur d'Alene, Idaho, purchase the two notes here in suit?

"Answer: Yes.

"Special Verdict No. 2

"If you answer special verdict No. 1 in the affirmative, state when and for what amount said notes were purchased by the First Exchange National Bank of Coeur d'Alene, Idaho.

"Answer: $4,100.

"Special Verdict No. 3

"If you answer special verdict No. 1 in the affirmative, state if the First Exchange National Bank of Coeur d'Alene, Idaho, purchased said notes in good faith?

"Answer: No.

"Special Verdict No. 4

"If you answer special verdict No. 1 in the affirmative, state if the First Exchange National Bank of Coeur d'Alene, Idaho, had at the time of purchase any notice of any alleged false and fraudulent representations made by Brockman to the defendant by which she was induced to sign the notes?

"Answer: No.

"Special Verdict No. 5

"If you answer special verdict No. 4 in the negative, then answer if the plaintiff was a party to any fraud or illegality affecting these notes?

"Answer: Yes."

While there was but one set of these special and general verdicts, they are all treated by the court and the parties, as they manifestly were intended by the jury, as being applicable to both actions. Counsel for the improvement company moved for judgments in its favor upon the special verdicts notwithstanding the general verdict, upon the theory that the special verdicts are inconsistent with the general verdict and are such as to entitle the improvement company to judgments awarding to it recovery upon the notes. Counsel for Mrs. Sandygren moved for judgments in her favor

upon the general verdict, upon the theory that the special verdicts are not so inconsistent therewith as to render the general verdict of no effect; and, in the event of that motion being denied, that she be awarded a new trial. The trial court granted the improvement company's motion for judgments upon the special verdicts notwithstanding the general verdict, and rendered a judgment in each action awarding recovery against Mrs. Sandygren upon the respective notes with interest, attorney's fees and costs; denied her motion for judgment upon the general verdict and also denied her alternative motion for a new trial. From this disposition of the actions by the superior court, Mrs. Sandygren has appealed to this court.

As we view this record and the argument of respective counsel, our problem seems to be this: (1) As to whether or not the special verdicts clearly, affirmatively call for judgment as rendered by the trial court in favor of the improvement company notwithstanding the general verdict in favor of Mrs. Sandygren. (2) If that inquiry be answered in the negative, then as to whether or not the special verdicts are, in any event, so inconsistent with the general verdict and with each other as to negative the right of Mrs. Sandygren to have judgment rendered upon this record in her favor; and (3) If that inquiry be answered in the negative, what disposition should be made of the case by us.

Special verdict No. 1, that the Idaho bank purchased the notes, is, of course, not inconsistent with the general verdict in favor of Mrs. Sandygren, since the bank, and also the improvement company, upon sufficient showing, could be charged with notice of infirmity in the notes, as well as Brockman, as the original payee, could be so charged.

Special verdict No. 2, that the notes were purchased for four thousand one hundred dollars, is not incon-

sistent with the general verdict in favor of Mrs. Sandygren. Indeed, it lends some support to the general verdict, since it finds, in effect, that the notes were purchased at the somewhat large discount of eighteen per cent, which is a circumstance lending some support to the general verdict in favor of Mrs. Sandygren, though not at all conclusive in her favor. *First National Bank of Ritzville v. Egbers,* 130 Wash. 221, 226 Pac. 492.

Special verdict No. 3, that the Idaho bank did not purchase the notes in good faith, is not inconsistent with the general verdict in favor of Mrs. Sandygren. That special verdict, standing alone, supports the general verdict.

Special verdict No. 4, that the Idaho bank, at the time of purchasing the notes, had no notice of any alleged false and fraudulent representations made by Brockman to Mrs. Sandygren by which she was induced to sign the notes, is inconsistent with the general verdict in favor of Mrs. Sandygren. That special verdict, standing alone, would call for the judgment which was rendered in favor of the improvement company notwithstanding the general verdict in favor of Mrs. Sandygren.

Special verdict No. 5 has no other effect than to place the improvement company in the shoes of the Idaho bank; that is, to render the improvement company chargeable with notice of infirmities in the notes as the Idaho bank was so charged.

[1] It seems to us, that these considerations call for the conclusion that the improvement company is not entitled to judgments upon the notes notwithstanding the general verdict in favor of Mrs. Sandygren, because special verdict No. 4, upon which such judgment must rest, is plainly negatived by special verdict No. 3. In other words, reading these two special verdicts to-

gether, they do not clearly show the improvement company entitled to judgments notwithstanding the general verdict. They are so contradictory as to destroy each other, in so far as either lends support to judgments in favor of the improvement company. We are, therefore, of the opinion that the trial court was in error in rendering judgments in favor of the improvement company upon the theory that the special verdicts call for such judgments notwithstanding the general verdict.

It seems to us that Mrs. Sandygren must also fail in her claim for judgments in her favor upon the general verdict, since special verdict No. 4 negatives her right in that behalf, though special verdict No. 3 supports her claim in that behalf. There is a sense in which these two special verdicts may be considered as destroying each other. They do have that effect in so far as either can be the basis, standing alone, of any judgment for or against either of the parties to this action. But we think special verdict No. 4 also destroys the effect of the general verdict in favor of Mrs. Sandygren. For, manifestly, if the notes were purchased by the Idaho bank without notice of the alleged false and fraudulent representations made by Brockman to Mrs. Sandygren inducing her to execute them, the general verdict in her favor could not have been correctly rendered by the jury. Noting this inconsistency between special verdict No. 4 and the general verdict, and the inconsistency between special verdict No. 3 and special verdict No. 4, it is plain, we think, that the jury did not at all comprehend the issues in the case, and that therefore Mrs. Sandygren, as well as the improvement company, is not entitled to judgment in her favor upon the general verdict. The problem is an involved one, by reason of this double inconsistency. We do not deem it necessary to here notice the numerous de-

cisions of the courts touching the general subject. In 38 Cyc. 1926 and 27 R. C. L. 879 are found observations which we regard as lending support to our conclusion that no judgment can be rightfully rendered upon this record in favor of either the improvement company or Mrs. Sandygren.

What then shall we do with the case? The answer to this question, we think, is found in the fact that the case remains undisposed of, and without a record enabling the superior court or this court to lawfully pronounce a final judgment for, or against, either of the parties. This manifestly means that the case should be regarded as still pending and undisposed of, and that therefore a new trial should be directed; this regardless of want of timely motion by either party in that behalf. It is insisted that Mrs. Sandygren's alternative motion for new trial was not timely made.

The judgments rendered against Mrs. Sandygren are reversed, and the causes remanded to the superior court, with directions to order a new trial and take such further proceedings as may not be inconsistent with the views herein expressed.

TOLMAN, C. J., FULLERTON, MAIN, HOLCOMB, ASKREN, and MACKINTOSH, JJ., concur.

BRIDGES, J. (concurring)—After much consideration in an effort to agree with the majority opinion, I am unable so to do. It states that special verdict No. 4 is inconsistent with the general verdict. I cannot see that it is. That finding does nothing more nor less than state that, at the time the bank purchased the notes, it did not have any notice of any alleged false or fraudulent representations made by *Brockman* to the *appellant* which induced her to give the notes. The jury could not have found otherwise, because there is no testimony even tending to show that the bank knew

anything about Brockman's representations or that he even made any. But it does not necessarily follow that the bank had not other knowledge concerning the fairness of the note transaction, and if it had any such knowledge before it purchased the notes, it would be immaterial that it did not have knowledge of the misrepresentations that had been made by Brockman. But after two or three attempts, this court seems unable to agree upon the meaning of some of the special verdicts of the jury and what effect should be given to them. Such being the case, it is not improbable, as said by the majority opinion, "that the jury did not at all comprehend the issues in the case." For this reason, and not because I construe the special findings as does the majority opinion, I concur in the result of that opinion. Under such circumstances, it would seem to be wise to let the case be re-tried.

MITCHELL, J. (dissenting)—I cannot concur in the majority opinion. In my opinion, the jury had a clear conception of its duties in answering the special verdicts so as to avoid any inconsistency in them, or between them and the general verdict, under the law and under the facts in this case.

That Brockman committed a positive fraud on the appellant in obtaining the notes, there can be no doubt. I do not understand that the respondent contends otherwise. The evidence was that, after several visits and upon his gaining her confidence, he represented to her that the company had one flowing oil well served by a pipe line that led to a trunk or main pipe line; that they wanted money to sink another well, but preferred not getting money from the banks as the banks were trying to control the oil company and its property; and, he had an accomplice with him who, in Brockman's presence, stated to her that he was already

getting three hundred dollars monthly dividends on his stock in the oil company. These representations, and some others, were shown to be false, but believing them to be true and relying on them she gave the notes. The notes were without consideration. At the time the notes were given and thereafter, two certain persons were officers of the bank and at the same time officers of the respondent. Each of them took part in the negotiations that resulted in the purchase of the notes. There was testimony that one of the officers, who resided in Idaho, learned that the notes were given for oil company stock and learned the name of the company the stock of which was given, and that he stated the reason the notes would not be purchased, except at the large discount, was that they were oil stock notes for which there was no sale at that time on the Spokane market. There was testimony also that the other officer, who resided in Spokane, stated in a conversation with a third person during a business transaction with him prior to the purchase of these notes, upon referring to this same oil company, "Why didn't you come to me and ask me to give you advice along that line," that he "had known them since the beginning of this oil scheme, . . . it was a crooked scheme from start to finish."

Applicable portions of the negotiable instruments law are Rem. Comp. Stat., §§ 3443 and 3447 [P. C. §§ 4123 and 4127]. The pertinent portion of the first is:

"A holder in due course is a holder who has taken the instrument under the following conditions, . . . 3. That he took it in good faith and for value; 4. That at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it."

The other section provides:

"To constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the

same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith."

The language is in the disjunctive, it speaks of an infirmity in the instrument *or* defect *or* knowledge of such facts that his action in taking the instrument amounted to bad faith. The notes in question having no consideration were void as between the parties to the notes. The payee in the notes got no title to them because of his fraud. The statute, Rem. Comp. Stat., § 3446 [P. C. § 4126], says so.

It cannot be denied that the jury had the right to believe that the bank did have actual knowledge of the infirmity, that it did know that the instruments possessed infirmity and that the payee's title to them was defective, because, at the time it took the notes, it knew they had been given for stock in an oil company that was "a crooked scheme from start to finish."

Special verdict number 4 says that at the time the First Exchange National Bank of Coeur d'Alene, Idaho, purchased the notes it did not have any notice of any alleged false and fraudulent representations *made by Brockman* to the appellant, by which she was induced to sign the notes. But what of it? It was neither important nor indispensable, under the facts in the case, that the bank should be apprised of the false representations Brockman made to the appellant in procuring the notes in order to charge it with not being a holder in due course, because at and prior to its purchase it had *actual* knowledge of infirmity in the instruments and defect in the title of the person negotiating them. The special verdict, so highly appraised for the purpose of destroying the general verdict, is wholly lacking in the matter of knowledge of infirmity and defect of title actually existing within the inde-

pendent knowledge of the purchaser, and hence its weakness for that purpose.

If special verdict number 4 said that the bank at the time of the purchase *had no notice concerning the facts with reference to which alleged false representations were made by Brockman,* the situation would be different. But it does not say so. It does not so much as say that the bank did not have knowledge of such facts that its action in taking the instruments amounted to bad faith, but it simply says and means that the bank had no notice of what Brockman told Mrs. Sandygren that induced her to sign the notes. That finding, however, in no way interfered with their finding by a general verdict in her favor, under the law and the instructions of the court, because of other evidence in the case showing actual knowledge on the part of the bank that the oil company had been born and continued in iniquity.

The appellant having shown that the notes were without consideration and the title of the payee therefore defective, the burden of proof then fell upon the respondent to show that it acquired title as a holder in due course. In doing so, it must show among other things that, at the time the notes were negotiated to it, it had no notice of any infirmity therein or defect in the title of the payee. *Keene v. Behan,* 40 Wash. 505, 82 Pac. 884, and statutes and cases cited therein; *Union Investment Co. v. Rosenzweig,* 79 Wash. 112, 139 Pac. 874. The general verdict in this case, which rests upon evidence wholly separate from that to which special verdict number 4 relates, says in legal effect that that burden was not met by the respondent, because it was shown to have had actual knowledge that the notes were without consideration.

The rule is that a special verdict must be irreconcilably inconsistent with the general verdict before the latter can be set aside. *Gaudie v. Northern Lumber*

*Co.,* 34 Wash. 34, 74 Pac. 1009. In a number of our cases, the makers of notes have been allowed to prevail over suitors who claimed to be holders in due course, where there was no attempt to show that the holders had any knowledge of the false representations made by those who induced the makers to sign the notes. The following are some of such cases: *Union Investment Co. v. Rosenzweig,* 79 Wash. 112, 139 Pac. 874; *Barry v. Danielson,* 78 Wash. 453, 139 Pac. 223; *National Bank of Commerce v. Drewry,* 70 Wash. 577, 127 Pac. 102; *Citizens Sav. Bank v. Houtchens,* 64 Wash. 275, 116 Pac. 866, and *Johnson County Savings Bank v. Rapp,* 47 Wash. 30, 91 Pac. 382. The same principle was involved in *Ireland v. Scharpenberg,* 54 Wash. 558, 103 Pac. 801, where there was a reversal of a judgment on a directed verdict against the makers of a note.

In *Hamilton v. Mihills,* 92 Wash. 675, 159 Pac. 887, the plaintiff sued as a holder in due course of a negotiable promissory note made by the defendant to the Orofino Portland Cement Company. The defenses were the same as in the present case. A judgment for the defendant was affirmed on appeal. In that case it appeared that on April 20, 1912, one Dunnett, an officer of the company, in consideration of five thousand dollars of the bonds and five thousand dollars of the stock of the cement company, obtained for the company one hundred dollars in cash and a note to it in the sum of four thousand nine hundred dollars from Mihills, due February 1, 1913, by fraudulent representations as to the condition of the company. Mihills deposited with the company certain timber company stock as collateral. No attempt was made to collect the note. Dunnett later again represented falsely that the cement company had arranged for the advancement of a large sum of money by one Kastle, a Nebraska banker, to construct a unit plant. Mihill, relying on the representa-

tion, gave a new note to the cement company on September 26, 1913, in the sum of four thousand nine hundred dollars and soon thereafter paid five hundred dollars on it. The note became due February 1, 1924. Meanwhile in July, 1913, Hamilton became active president and manager of the cement company. In January, 1914, before maturity of the note, defendant's note with others were transferred by the company to Hamilton as collateral. The cement company, it appears, owned no property, only an option to purchase limestone land. Hamilton sued on the note. In the opinion it was said:

"Though he [Hamilton] *denies any knowledge of the representations made to defendant by Dunnett, it is at least certain that he* knew what the note was given for."

Further,

"Defendant testified that Hamilton personally assured him that he intended to sue Kastle and make him 'come through' on his agreement to finance the building of the mill, and that this was before the note was transferred to Hamilton."

Thus the court took into consideration two things in deciding the case, (1) the certainty of Hamilton's knowledge that the note sued on was given for stock in a worthless corporation, and (2) a dispute as to whether or not Hamilton had knowledge prior to his purchase of the note of the false representation that Kastle was to finance the building of the unit. Then, in deciding that the trial court was right in holding that Hamilton was not a holder in due course, this court said:

"Was the appellant a *bona fide* holder? At the time he took these notes as collateral security he was, and for some time prior thereto had been, president of the company and in active management of its affairs. He must have known that the only assets of the company were merely options on the limestone land. It is con-

ceded that he knew the note was given for the bonds and stock. *It cannot be doubted that he knew both bonds and stock were practically valueless.* Though there is some evidence from which it might reasonably be inferred that he had learned, prior to acquiring this note, that respondent had been led to believe that the company had a certain and enforcible agreement with Kastle to finance the building of a plant, *we find it unnecessary to hold that he had full knowledge of Dunnett's representations. In any event, he is charged with knowledge of the failure of consideration.* Even assuming, therefore, that he purchased this note before its maturity, he took it charged with knowledge of the infirmity of its consideration."

That is, whether or not he had notice of the false representations made by Dunnett that Kastle was to finance the company was not controlling, nor was it inconsistent with Hamilton's knowledge that the note was given for bonds and stock that were practically valueless—knowledge of the infirmity of the note on account of its lack of consideration.

In the case of *Ozark Motor Co. v. Horton,* 196 S. W. (Mo. App.) 395, the suit was on a negotiable instrument. The plaintiff alleged it was a holder in due course. The negotiable instrument law of that state is like ours. In discussing the same kind of question that is involved in the present case, the court said:

"In establishing that the note was procured by fraud, it is necessary to allege and prove the specific facts constituting the fraud; but, such fraud being once established, it is sufficient, on the question of notice or knowledge thereof, to prove that the purchaser of the note had knowledge that the note was in some way tainted with fraud; and it is not necessary that he have knowledge of the particulars of the fraud, or even of the nature of the fraud. It is said in 8 C. J. 506:

'It is sufficient to affect a purchaser with notice that he had knowledge of fraud or illegality in the transaction as a whole, and notice of the specific facts which

impeach the validity of the instrument or transaction need not be brought home to him.' 1 Daniels on Negotiable Instruments, 799.''

If in special verdict number 4 the jury had gone further and found that the bank, in taking the notes, did not have knowledge of the infirmity in them, nor defect in the title of the payee, nor knowledge of such facts that its action in taking them amounted to bad faith, then the general verdict for the defendant could not stand, but it is not so comprehensive nor, as already stated, can it be said that there is the least inconsistency between the special and general verdicts. Nor is there, upon the views herein expressed, any conflict between special verdicts numbered 3 and 4.