MARTIN DAHMER, JR., *Admr., Etc.*

**v.**

THE STATE FAIR OF WEST VIRGINIA, INC.

(No. 10748)

Submitted January 24, 1956.  Decided February 28, 1956.

*John A. Lile,* for plaintiffs in error.

*A. E. Cooper, C. A. McHale,* for defendant in error.

RILEY, JUDGE:

Martin Dahmer, Jr., Administrator of the estate of Martin Van Buren Dahmer, deceased, instituted in the Circuit Court of Greenbrier County this action of trespass on the case against The State Fair of West Virginia, a corporation, hereinafter sometimes referred to as "State Fair", to recover damages of ten thousand dollars for decedent's death allegedly occasioned by State Fair's negligent failure to provide decedent with a reasonably safe place in which to work. The jury having returned a verdict for the full amount sought to be recovered, and the trial court having entered judgment thereon, State Fair prosecutes this writ of error to that judgment.

The decedent, Martin Van Buren Dahmer, had been employed as a special officer by State Fair at its race track, situated half-way between Lewisburg and Ronceverte in Greenbrier County, and was so employed on August 29, 1953, the date on which he was fatally injured when struck by a riderless, runaway horse during a race.

For many years prior to August 29, 1953, State Fair had operated a county fair in Greenbrier County, which was generally regarded by residents of the entire State

of West Virginia as the "State Fair". Its operation, suspended during World War II and resumed thereafter, included the maintenance and operation of a race track. The locale of the accident, which resulted in decedent's death, is depicted both in photographs introduced by plaintiff (Exhibits Nos. 1 to 5, inclusive) and by testimony of the witnesses. The race track, lying between an infield fence and an outfield fence, was fifty-five or fifty-six feet in width at the point where decedent was injured. The record shows that in front of the grandstand at the race track there was a picket fence approximately four feet high, at the south end of which there was a three-plank fence thirty-four inches in height running down to the gate at which decedent was stationed at the time of his injury; the gate, described as a plank gate, was two inches higher than the fence which, proceeding in a southerly direction and following a rise in the ground, attained a height of forty-two to forty-six inches. According to defendant's testimony, there was a strip of grass approximately thirty inches wide directly in front of and adjacent to the grandstand; the width of this grassy strip increased until at the gate its width was from seven to eight feet; and south of that point the strip tapered down to approximately six to six and one-half feet.

On August 29, 1953, the date of injury, decedent was an employee of State Fair, his assignment as a special policeman being inside the race track. His station or territory was along the track's outside fence near the gate, through which the horses were led, and a small ticket office or booth, bearing the legend "Horse-Show Tickets." Although defendant's witness, Robert E. Sydenstricker, testified that decedent applied to him, as secretary of State Fair, for work in 1946, conditioning it upon his being assigned to the station at which he sustained his injury because he had "had that job * * * back in the 30's", witness, O. K. Pyles, who was in charge of State Fair's special police, related that he assigned decedent to the particular post for the week during which

decedent was injured, because of Dahmer's familiarity with it and that decedent did not request it. Asked what decedent's duties were, Pyles answered, "To keep the public off the fence and off the race track, * * to watch people at all times at that post", to "keep the crowd back", and "to open the gate" so that the horses could enter or leave the race track. Curtis Shawver, under whose direction Pyles worked, described decedent's duties to be "To protect the public and, at the same time, to protect himself", and to see that the gate remained closed during the actual running of the races. Both Pyles and Shawver were positive in their testimony that decedent's duties did not include management of the race horses, and that he had nothing to do with the actual running of races or with the horses entered in the races. While Shawver related that he did not instruct decedent individually as to his duties, he "did in the entire group", and that decedent was in the group. On the other hand there is evidence that decedent had instructed a fellow-guard of the danger of his position, and that he had known horses to fall down and to be "on the lookout".

A large crowd attended the races on Saturday, August 29, 1953. Reverend Emory A. McGraw, another special police employed by State Fair, told the jury that the crowd along the fence was packed "about as close as you could get them." The last race of the day and of the Fair took place about four-thirty in the afternoon, a five-eighths mile running race. Decedent was then at his station and, as one witness stated, was sitting on a "pop crate" at the gate until the race started, and then he "was up and was standing there." According to defendant's witness, Joe McWhorter, the timer of the races, who at the start of the race, was stationed in the judges' stand, noticed that the saddle on one of the horses - a gray one - began to slip about one-sixteenth of a mile from the start, the jockey rolled under "went off - you might say, between the gate going into the grandstand on the south side of the grandstand." The horse kept running "perfectly straight". Continuing

without a jockey, the horse struck decedent, and, according to plaintiff's witnesses McGraw and Ernest Kerns, also employed as a special police, the horse continued around the track and came back a second time, at which time he was "still running rather wild", and would have run over decedent again if someone had not "sort of wave(d) him away." The horse on the first trip around the track inflicted the injuries of which decedent died two days later. As detailed by Dr. Philip W. Oden, the attending physician, Dahmer "was in a marked condition of shock and he had compound comminuted fractures of both bones of the left leg and he had two vertebrae of the back fractured", and seven ribs on the right side of the chest crushed. Required surgery was unsuccessful, and death, according to this physician, resulted from the injury.

The parties stipulated, out of the jury's presence, that State Fair "was not a subscriber to and was not paying into the Workmen's Compensation Fund of the State of West Virginia" on the day of the injury.

While it is clear from the evidence that the runaway horse struck or ran over the decedent, the witnesses are not in agreement as to where on the race track this occurred. Plaintiff's witness McGraw, who placed himself as a special policeman on the inside of the track between decedent and the grandstand when the accident occurred, testified that decedent was only three feet from the fence when he was struck by the horse, and that he had moved from the fence where he had been standing toward the track a distance of three feet. Ernest Kerns, another of plaintiff's witnesses, fixed the distance as "two or three feet from the fence", and James Edwards and Forrest Foster, both witnesses for plaintiff, stated the distance as between three and four feet of the fence and three feet, respectively. According to another witness, Martin Clark, testifying for the plaintiff, who was standing approximately twelve feet back of the fence and that same distance from decedent, the distance "seemed about four or five feet from the rail-

ing." While Foster related on direct examination that Dahmer had not "run out on the track at all", on cross-examination he admitted that he did not know where Dahmer had been or what he had been doing just before the horse struck him. On the other hand, defendant's witnesses testified that decedent ran out on the track from three or four feet to "ten or twelve feet", and at least two of defendant witnesses, McWhorter and Charles Leslie, declared that decedent had reached the clay portion of the race track and was not on the grassy strip.

Likewise there is disagreement as to where decedent lay on the ground after the accident. One witness for plaintiff stated that decedent's head was "right close to" the fence; another who "wouldn't say there was any grass there", declared that decedent's feet were about "two feet to the fence"; while a third related that decedent's head was "two or three feet of the fence", and that his entire body was on the strip of grass. Defendant's witness McWhorter disagreed, declaring that decedent was not on the grass. However, he placed decedent's head "toward the fence and his feet toward the track", while defendant's witness Leslie testified that decedent fell with his head about two feet from the fence, "and his feet still on the clay."

Ernest Kerns, testifying on behalf of plaintiff, when asked how decedent caused the horse to change its path, replied that decedent "was using his cane". Kerns was positive that decedent did use the cane on the horse, but could not say where he hit the horse, stating that there was blood on the horse's neck or right shoulder. Several witnesses attest to the fact that after the accident the cane used by decedent was found broken. Witness McGraw related that he saw decedent step out from where he was "to wave the horse down." According to plaintiff's witness Kerns it seemed to him that Dahmer "was trying to stop the horse to keep the horse from jumping over the fence." Likewise, according to plaintiff's wit-

ness, Martin Clark, it seemed to him "like the horse was trying to get out and go to the stable", but that with "the excitement of the crowd", the horse "kept right on down and hit him."

On rebuttal plaintiff's witness, Ernest Kerns, testified that the horse that ran over decedent was kept in a stable at the corner or far end of the grandstand in the direction of Ronceverte, and that some time after the race he saw the horse brought back to this stable. However, defendant's witness, Frank Wilson, who on the day decedent was fatally injured, was superintendent of the racing and had charge of the running, trotting and pacing races at the Fair, testified that "on the far side of the track" from the grandstand, he saw the gray horse come to a trot, apparently, and, as witness tried to catch him, the horse "straddled the fence and trotted up for about four (4) panels then he swerved over and lunged in the harness horse barn to a stall", which stall was on the opposite side of the track from the grandstand.

Plaintiff's witness McGraw testified that Dahmer stepped out in front of the riderless horse and "threw up his hands." This testimony is corroborated by defendant's witness, Charles Leslie, who related that he was "right beside" Dahmer when the race started; that Dahmer was up and standing there, and that when the riderless horse came down Dahmer went out and started "waving his hands and cane and trying to stop the horse." Leslie also testified that it seemed as if the horse carried Dahmer ten feet "before the horse got loose from him." Another of defendant's witnesses, Sam Hinkle, testified that when he first saw Dahmer "it looked like he had made a few steps out"; and that the "horse was coming and he [Dahmer] threw up his cane."

Forrest Foster, testifying on behalf of plaintiff, related that he saw Dahmer's hand "go up as if he was going to stop the horse then the horse hit him."

The record establishes that there were ten or twelve

horses in the race during which decendent was injured, and that the riderless horse was the last one out.

While plaintiff's witness McGraw testified that there were no safety measures at the race track or safety exits which special police in "such a contingency" could use, unless "you are a right good jumper and jumped clear over the crowd"; that when the runaway horse passed him, he "ran to the fence", but that there was no use trying to get over the fence because of the crowd, on cross-examination this witness admitted making the statement that "If Mr. Dahmer had not run out on the track to get the horse, he would not have been hurt"; and that he, McGraw, was "closer to the horse than Mr. Dahmer was", and "got out of the way."

Plaintiff's witness Kerns, a special policeman, who was also carrying a cane, testified that the only means of escape provided by State Fair at the posts where Dahmer and he were stationed were "just the gates, but you couldn't open them with the crowd up against them." This witness, however, related that he "went over the fence", pushing a couple of people out of the way to get across it.

Charles Leslie, a carpenter on the maintenance crew at the Fair, who placed himself "right beside" Dahmer, related that if Dahmer had been standing where he was at the time the race started, he could not have been hit by the horse.

Probably the witnesses who had the best opportunity to observe the actual happenings at the time decedent was struck by the runaway horse were defendant's witnesses, Joe McWhorter and Alex Arbuckle, racing judges, who were stationed in the judges' stand about ten feet above the track, and almost directly opposite the track from the place where decedent was injured, and could observe the gray horse from the start of the five-eighths mile race, in which the gray horse was entered, until the horse ran over and fatally injured decedent, and as

the horse ran around the track a second time after running over decedent.

McWhorter testified that he noticed that the gray horse was giving trouble as soon as the race started, and that the horse's saddle even at the beginning of the race had started to slip; that at that time he was in the judges' stand, directly in front of the grandstand; that the gray horse was running on the outside; that decedent ran out from the grass plot on the clay after the horse threw the jockey, and was waving his arms at the horse; that at that time there were two or three horses in front of the runaway horse, but, nevertheless, Dahmer stepped in front of the gray horse and waved his arms; that then the gray horse was running straight with the rest of the field; that the horse was conducting himself as a horse ordinarily would in a running race, though he did not then have a jockey; that at the time Dahmer was fatally injured the gray horse was running on the wide clay track outside the grass which bordered the fences of the race track; that when decedent ran on the track waving his cane, with which he struck the horse, the horse continued to run with the rest of the field and did not swerve. The witness McWhorter, who testified that from the judges' stand he was in a position to see the entire event, testified that it seemed to him that "It was the same as standing in front of an automobile without a driver, trying to stop it." Thereafter, McWhorter's testimony is to the effect that the horse continued around the track, and was finally stopped after the second lap.

Alex Arbuckle, a witness for defendant, also one of the racing judges, was occupying a position in the judges' stand beside McWhorter, testified that he saw the start of the five-eighths mile race; that he observed the gray horse, referred to by counsel for the defendant on his examination of the witness as the "white horse", as it ran over decedent; that at the time decedent was run over, the horse was riderless; that when decedent was

run over he was about six or seven feet from the outside fence of the track; that he was watching the horse until it got to the place where decedent was standing; and in answer to the inquiry whether "he was standing on the grass", the witness replied, "He was standing inside the track"; and that when the horse struck decedent it seemed to the witness that the impact carried him ten feet and rolled decedent "Right on down the track", so that when the horse and decedent were separated, decedent's head was lying in the track about the same distance.

On cross-examination this witness testified that as the horse ran down in front of the grandstand until it reached the place where decedent was standing it was about five or six feet from the fence. This witness, however, did not notice whether there was any grass at the gate where decedent was standing, but that after decedent was struck, it appeared to the witness that he was carried on down the track, "I would say about ten (10) feet, something like that, maybe six (6). It just looked like the horse couldn't get loose from him. I don't know whether he got hold of the horse's rein or not. It just looked like the horse and man couldn't get apart." He further testified that after decedent was separated from the horse, his body was thrown about the same distance from the fence as it was when decedent was struck.

The defendant, The State Fair of West Virginia, Inc., being an employer subject to the provisions of Chapter 131, Acts of the Legislature, Regular Session, 1945, and not embraced within the exceptions contained in Section 8, Article 2, Chapter 131, and having elected not to pay into the Workmen's Compensation Fund as a subscriber is, in this action for the alleged wrongful death of plaintiff's decedent, deprived under the provisions of Section 8 of the following common-law defenses: (1) The defense of the fellow-servant rule; (2) the defense of the assumption of risk; (3) the defense of contributory negligence; and (4) "any defense that the negligence in question was that of some one whose duties are prescribed by statute." It follows that the factual questions

submitted to the jury are narrowed to the question: (1) Whether the defendant failed to use reasonable care in furnishing decedent with a safe place to work, which alleged failure on the part of the defendant proximately caused decedent's death; or (2) whether decedent's death was the proximate result of the sole negligence on the part of decedent, as distinguished from contributory negligence on decedent's part.

In the appraisement of this case, bearing as it does upon the question whether decedent's death was the proximate result of the negligence of the defendant corporation in failing to use reasonable care to furnish decedent a safe place in which to work, or whether decedent's own action in reference to the runaway horse was, as a matter of law, the sole proximate cause of decedent's fatal injuries, it must be said that defendant corporation did not provide along its track at the place where decedent was stationed any partition or escape outlet for the special police during the running of the races. This record, however, is devoid of any evidence, which in view of the crowds which the evidence discloses usually attend the running and harness races conducted at the State Fair, and the manner in which both the running and harness races are conducted, how in any practicable manner a partition or escape outlet for the safety of special police assigned to positions on the track side of the fences around the track could be constructed.

The gravamen of plaintiff's cause of action, as set forth in the allegations of the declaration and presented to the jury in plaintiff's instructions, which the court read to the jury, is that the defendant is guilty of actionable negligence in that being decedent's employer, defendant did not use ordinary care to provide a reasonably safe place for decedent to work. In so far as the structure and conditions of the fences and the gate are concerned, it seems clear to this Court that there is insufficient evidence in this record from which the jury could find from a preponderance thereof that decedent's fatal injuries were caused by any defect in defendant's

race track, the fences around it, and the gate to which decedent was assigned. The fact that decedent's work as a special police officer at the place to which he was assigned was accompanied by some inherent danger does not constitute a violation of defendant's duty to decedent to furnish him a reasonably safe place in which to work. The rule is aptly stated in 12 M. J., Master and Servant, Section 21, as follows: "It is the duty of a master to furnish his servant a reasonably safe place in which to work; not an absolutely safe place, nor the safer or safest place. Or, stated otherwise, the obligation of the master is not to provide a safe place for his servant to work, but to use ordinary care to provide a reasonably safe place, considering the character of the work." In *Schilling* v. *H. Koppers Co.*, 83 W. Va. 737, 99 S. E. 75, pts. 5 and 6 of the syllabus, this Court held:

> "In any case where the question is for the jury to determine whether the master has provided a reasonably safe place within which the servant is called upon to perform his duties, it is error to instruct the jury that the duty of the master is to provide a *safe* place therefor. Such an instruction is misleading in that it imposes upon the master a higher duty than is imposed by law.

> "The master has performed his duty to provide a reasonably safe place for his servants when he has exercised reasonable care and diligence to provide such place."

See also point 1, syllabus, *Barr* v. *Knotts*, 101 W. Va. 440, 133 S. E. 114.

Notwithstanding the conjectural testimony of plaintiff's witness, Ernest Kerns, to the effect that the horse "was right again the fence like he was going to come over it", and plaintiff's witness, Martin Clark, to the effect that "It seemed like the horse was trying to get out and go to the stable", the undisputed fact established by this record is that the decedent, when he saw the oncoming riderless horse, stepped two or three feet,

according to some witnesses, and ten or twelve feet, according to one witness, from the place of safety where he had been sitting on a "pop crate" next to the fence, or standing against a small ticket office, waving his arms and striking the horse with his cane, when he was run down and fatally injured.

Defendant's witness, Emory A. McGraw, on cross-examination testified that he kept next to the fence, and the horse only "brushed" him; and that possibly decedent would not have been hit if he had stayed in the position he was at the start of the race. Defendant's witness, Charles Leslie, who testified that decedent was standing "right beside of me", also testified that decedent went to the edge of the track "ten (10) or twelve (12) feet", from where he had been when the race started, and this witness, remaining where he had been standing next to the fence, was likewise unhurt. This testimony, coupled with the uncontradicted evidence in this case that decedent stepped away from the gate and fence at which he was stationed toward or on the clay part of the race track in an effort to stop the runaway horse, considered with the testimony of Joe McWhorter and Alex Arbuckle, the racing judges, who were in the judges' stand almost directly across the track from the place at which decedent was injured, where they could view the race from its start to its end, prompts this Court to hold, to use the language contained in 12 M. J., Master and Servant, Section 21, that decedent's fatal injuries were not caused by the failure of the defendant, The State Fair of West Virginia, Inc., "to use ordinary care to provide [decedent] a reasonably safe place, considering the character of the work"; but, on the contrary, decedent's activities in reference to the oncoming runaway horse were, as a matter of law, the sole proximate cause of decedent's death.

For the foregoing reasons and on the basis of the sufficiency of the evidence alone, the judgment of the Circuit Court of Greenbrier County should be reversed, the verdict set aside, and a new trial awarded.

As the issue submitted to the jury, as shown by plaintiff's declaration, the evidence adduced on behalf of both plaintiff and defendant and the instructions of the court given on behalf of both plaintiff and defendant, was whether the defendant was guilty of actionable negligence in failing to use ordinary care to provide a reasonably safe place for decedent to work, considering the character of the work, the question arises whether the general verdict of the jury in favor of the plaintiff and against the defendant in the amount of ten thousand dollars should remain undisturbed, in view of the jury's answers to two special interrogatories. At the time the case was submitted to the jury, the jury was instructed that: "If you are of opinion to find in favor of the plaintiff and against the defendant, you will answer the following interrogatories:

"Do you find as a fact that the defendant, The State Fair of West Virginia, was guilty of negligence in the death of Martin Dahmer?

"If so, in what respect did The State Fair of West Virginia fail in its duty to Mr. Dahmer and thus become guilty of negligence?"

To Interrogatory No. 1 the jury answered, "Yes"; and to Interrogatory No. 2 the jury responded: "By not furnishing a place of safety for the police off the main track. Also recommend that a fence of considerable height be erected around track."

Unlike the practice prevailing in Virginia, by virtue of Code, 56-6-5, trial courts in this State are authorized upon the trial of issues to submit special interrogatories to the jury, and to require the jury either to render separate verdicts upon the issues or find in writing upon particular questions of fact. This section of the Code provides that: "The action of the court upon such motions shall be subject to review as in other cases. Where any such separate verdict or special findings shall be inconsistent with the general verdict, the former shall control the latter, and the court shall give judgment accordingly."

The jury's answer to the second interrogatory to the

effect that defendant was guilty of negligence in decedent's death "By not furnishing a place of safety for the police off the main track. * * *" is a clear indication that the jury in arriving at its general verdict had misconceived the issue before it, and that the jury's response to the second special interrogatory shows that the general verdict must have been based upon a theory of the case different from that contended for by the plaintiff, and not involved in the issue before the jury. In Clementson on Special Verdicts and Special Findings by Juries, the rule is stated on page 118 as follows: "Findings must respond to the issues submitted. A special finding which clearly shows that the jury must have based their verdict on a theory of the case radically different from that contended for by the prevailing party, and not involved in the issues submitted for their determination, will authorize a reversal of the judgment." In point 3 of the syllabus of *Aultman & Taylor Machinery Co.* v. *Wier, et al.* 67 Kan. 674, 74 P. 227, written by the Court, the Supreme Court of Kansas held: "A special finding which clearly shows that the jury must have based their general verdict upon a theory of the case radically different from that contended for by the prevailing party, and not involved in the issues submitted for their determination, will authorize a reversal of the judgment." In the syllabus, written by the Court, in the case of *First National Bank & Trust Co. of Tulsa* v. *Mitchell*, 191 Okla. 206, 127 P. 2d 825, the Supreme Court of Oklahoma held: "As a general rule, when answers to special interrogatories are returned in connection with a general verdict, final judgment should be entered in the cause either on the verdict or contrary to the verdict and in accord with the special findings. However, when such confusion is created by a conflict between the special findings and the verdict as to indicate that the jury did not intelligently consider the case and the trial court so finds or should so find in the exercise of judicial discretion, a new trial should be ordered." See also *Great Western Land & Improvement Co.* v. *Sandygren*, 141 Wash. 451, 252 P. 123.

In the case at bar the jury evidently arrived at its general verdict upon the theory that in any event the defendant was under the duty to furnish decedent with a safe place to work, and the failure to perform that duty was the reason for the general verdict.

Upon the verdict and answers to the special interrogatories having been received and accepted by the trial court, the defendant moved the court to render judgment in favor of the defendant, notwithstanding the verdict of the jury, and likewise moved the court to set aside the verdict of the jury so returned and award a new trial, because the verdict is contrary to the law and evidence in the case, and further moved the court to set aside the verdict and grant a new trial for certain specified grounds, the sixth of which is as follows: "That negligence as found by the special interrogatory submitted to the jury with respect to the answer to Interrogatory No. 2 failed in reciting a failure of not furnishing a safe place for special police; said answer did not recite the intent of a reasonably safe place being required."

Likewise in point 4 of the assignments of error to this Court, the inconsistency of the answers of the jury to the special interrogatories is saved in this record for the consideration of this Court. As in the case at bar the answers of the jury to the special interrogatories exhibit that the jury must have based its general verdict in favor of the plaintiff on a theory radically different from that contained in plaintiff's instruction No. 1A, and not involved in the issues submitted to the jury for the determination by the jury of the factual issues involved, the judgment of the Circuit Court of Greenbrier County for this reason alone should be reversed, the verdict of the jury set aside, and a new trial awarded.

Therefore, for the foregoing reasons this Court reverses the judgment of the Circuit Court of Greenbrier County, sets aside the verdict of the jury, and awards the defendant a new trial.

*Judgment reversed;*
*verdict set aside;*
*new trial awarded.*